Thank you, Your Honor. May it please the Court. Tracy Dreisbel, Assistant Federal Public Defender. I represent Julio Pineda. I will be arguing on behalf of all three appellants today. This case is truly unprecedented. No court has ever held that the Foreign Commerce Clause authorizes the United States to prosecute wholly foreign criminal activity bearing no connection to the United States. What the government is seeking from this court is an unrestrained global jurisdiction over every incidence of drug trafficking anywhere in the world. As broad as the commerce power is, it is not without its outer limits, and those limits are found in the text. Article I grants Congress the power to regulate commerce with foreign nations. This does not encompass the power to regulate commerce among and between the United States, and it is not a global police and prosecutorial power. The government's argument in this case eliminates what the Supreme Court has termed the necessary predicate to the exercise of the power. With respect to the Foreign Commerce Clause, that necessary predicate is a relationship with the foreign nation. There must be some connection between the foreign nation and the United States. That necessary predicate cannot be made up for by a substantial effect on the United States, and we know that from National Federation of Independent Businesses versus Sebelius. In that case, although the facts were very distinguishable, the court held that the individual mandate of the Affordable Care Act could not be sustained on a Commerce Clause theory because the necessary predicate, which was in that case commercial activity, was not yet in existence. The power to regulate presupposes the activity being regulated. In this case, the power to regulate foreign commerce presupposes the commerce between the United States and the foreign country. The court below and the government is advocating a Wickard and Raich rationale, but that cannot apply here because the United States does not have the authority to regulate all drugs in all the world. Necessary to the court's analysis. Are you negating the argument, which is the Wickard argument, of the class of activities as a whole has a substantial effect on commerce with the United States? For example, this particular transaction, you could make the argument that because drug trafficking is international, if there are more drugs going into Costa Rica or less drugs going into Costa Rica, that affects the international market. That's kind of the Wickard argument. Are you saying that just won't fly no matter how substantial the effect? That is what I'm saying, Your Honor, and there are reasons for it. The first is that it's not simply that it's a regulatory scheme that was key to Wickard and Raich. It was that it was a closed regulatory scheme. What the court held was that when Congress has the authority to regulate the entire class, it can find that individual incidences of that only have a de minimis and not a substantial effect on commerce. We do not have the authority to regulate all drug transactions in all the world, and that is what would be required for Wickard and Raich to apply internationally. Let me ask you this. The sex trafficking statute, which is, as you say, this may be unprecedented in this circumstance, but the sex trafficking cases are somewhat relevant, begins whoever knowingly in or affecting interstate or foreign commerce. The drug statute does not, but if the drug statute had the same language, would that allow it to be constitutional and then make it a jury issue for whether this particular transaction was, in fact, in or affecting foreign commerce? Yes, Your Honor. So far as commerce were defined, as I believe it is in the sex trafficking cases, as commerce with the United States. I mean, just to take an example, this is not in these facts, but if the government could produce evidence that when these drugs went back to Costa Rica, 90% of them were then re-exported to the United States. I think that becomes a line-drawing activity as to where the nexus has to be found, but certainly that could have been charged under the importing statute, and then it would be a jury question. And I think in that case, the constitutional analysis would be the exact same that we use for importing statutes. The fact that Bastogne and the statute in Bastogne had that jurisdictional hook has to be relevant, and we know that because this circuit, and I believe all circuits, have continued to affirm the constitutionality of 922G, the felon in possession statute, after Lopez. And the only constitutionally significant distinction between 922G and 922Q, which was the statute struck in Lopez, was the existence of that express hook linking cases to that affecting commerce. So if there were even a de minimis connection to commerce with the United States that was proven, or I would say required by the statute, but even proven on the facts, it would be a completely different argument. In the absence of such a connection, the Foreign Commerce Clause does not apply. I'll move on to the treaties. The treaties that the government has argued in this case simply do not allow for this. The court recognized in Beleza-Curtado that the UN Convention relies on domestic mechanisms and does not supplant traditional notions of jurisdiction. The Jamaican bilateral agreement, in fact, excludes this because it talks about jurisdiction seaward of the territorial sea. And I would also note that the bilateral agreement defines Jamaican waters and United States waters. Territorial waters and internal waters are defined the same way. So under this theory of this treaty, the Jamaican government could prosecute drug trafficking on the Mississippi. It simply doesn't apply. I pointed to Article 5 in the briefs. When you say it doesn't apply, you mean by the language of this particular treaty or that it couldn't come within the treaty power? I have preserved for further review the argument that the treaty power needs to be limited to Article 1. I think that's contrary to the law of the circuit at this time. My argument  Okay. So would you allow the possibility that if you were to win this case, the government would try to enact, at least with Jamaica or with individual countries, a treaty that clearly says, for example, you know, Jamaican, Jamaica is overloaded with drug cases and we need your help. And by treaty, we're going to allow you to prosecute people within our waters. Yes, Your Honor. Under current law, that would be constitutional. But this treaty does not allow it. The argument that the government has presented in this case eliminates the necessary predicate, which is a relationship with the United States and those of no limiting power. It's antithetical to our system of our Constitution as one creating limited and The MDLEA is part of a comprehensive regulatory scheme through which the United States and its international treaty partners combat the international drug trade, both on foreign flagged vessels and in foreign territorial waters. The Bastin and Raich framework, which are controlling authority as to the scope of Congress's commerce powers, and Bastin makes it clear that this applies to the Foreign Commerce Clause, which Bastin, in a line of cases established, applies at least as far as Raich held the Domestic Commerce Clause would, if not more. But at least as much was sufficient to uphold the application of U.S. law to sex trafficking occurring wholly within Australia. And the threshold for doing so was that Congress had a rational basis for finding that the activity in the aggregate had a substantial effect on commerce with foreign nations. And that is shown here. Are those exactly the same kind of findings in the drug statute? The drug statute at 7, I'm sorry, the MDLEA statute at 70501, Congress made specific findings that the trafficking of drugs on vessels was a threat to the security of the United States. The sex trafficking statute says affecting commerce, doesn't it? It's a finding that these activities affect commerce. Yes, there is not language that specifically references affecting commerce. Yeah, they're a different language. That is a different language. But I think it is shown in the record, in the legislative history and before this court, that the international drug trade certainly has an effect on the international drug trade, largely through this corridor in the Caribbean. This is marijuana. This is marijuana. Even marijuana, which is largely grown in the United States or Mexico, also, it is shown and is documented, travels through the Caribbean to the United States. The question is, could Congress find, rationally, reasonably find, that in the aggregate, the drug trade through the Caribbean on vessels presents a threat to the United States, implicating the United States' interests in general, not specific nexus to this transition. Let me stop you right there, because you may be, your statement may be perfectly true, but is threat to U.S. security allow you to come within the foreign commerce clause? Because this is the international drug trade, I think it is commerce by definition. This is, as this court found in Castillo recently, the international drug trade has implications for the, I mean, through drug organizations, through, which fund terrorism, which affect the United States economy in a myriad of ways. That was found in Castillo and in other recent unpublished decisions of this court, which addressed the basis for the safety valve not applying to the MDLEA in equal protection challenges. The court has listed the effects on the international drug trade, which is commerce by definition. Could Congress enact a statute that regulates, let's say, Chinese pollution? Because certainly, as we're seeing every day in the papers, worrying about Chinese exports to us, pollution, lax pollution means they can be cheaper, affects U.S. commerce, no doubt. Can they do that? What Raich establishes, and Bastin in this court has established, that the threshold for doing so is Congress would have to rationally find that that activity and the aggregate has a threat to, has an impact on commerce with foreign nations. Now, we don't have such a record as we do in this case with the drug trade. If there was such a- We're talking a hypothetical. Isn't that just as plausible? That is, I can get a hundred economists in here to say that that's exactly why we have problems in foreign commerce because of lax pollution laws, lax labor laws, and so forth. Or, we have problems with stock exchanges because we have Swiss fraudsters selling things to German investors. Well, certainly, the United States could establish a comprehensive treaty scheme, as was done in this case, if Congress made the findings that Raich requires. Really, it didn't happen already. Now, let me tie that to your colleague, perhaps quite legitimately, has given you two ways that you could fix this problem, you might say. One is a treaty with Jamaica or other individual countries, and the other is a jurisdictional hook like there is in the sex trafficking statute. Let me go to the- For a reason that's not good enough. Well, let me go to the treaty ones. I think that, exactly what my colleague says the treaties would have to do has been done in this case. I have to dispute her description of the treaty, which she says does not apply to this activity. I think I'm going to look at both the UN Convention and the bilateral agreement with Jamaica specifically, both of which contemplate action in the territorial waters of our treaty partner nations. In the UN Convention, I will refer this court to articles specifically 10 and 17. That's of the UN Convention, but more broadly, all of these articles, 3, 4, 9, 10, and 17, all contemplate cooperation to prosecute to the fullest extent of the law, trafficking on vessels with the cooperation of coastal states, that's Jamaica in this case, and transit states, through whose territory the drugs are moving. The transit state provision is in article 10, and the coastal state cooperation is in article 17, which specifically calls for the establishment of bilateral agreements so that treaty partner nations can cooperate with the prosecution of vessels with the cooperation of the coastal states. That's in article 17. So let's look at what bilateral agreement we've established with Jamaica, and we have 40 or so bilateral agreements with countries in the Caribbean and elsewhere. In the Jamaica... When you say 40, you're talking about dealing with the drug trade or with all different... Drug trade under the MDLE, to affect and enforce the MDLEA, bilateral agreements established under the auspices of the UN Convention, which is the broader multilateral treaty calling for states, saying states shall establish such domestic laws to effectuate this treaty and combat the trafficking of drugs on vessels to the fullest extent of the law. So let's look at the Jamaica Treaty. I'm going to refer... And both of which are before this court. They were submitted to this court. If you look at articles 6 and 10 of the Jamaica Bilateral Agreement, it talks about cooperation in party waters. Yes, there is a provision that talks about the rights of the parties in seaward waters. That's the high seas. But it also, in articles 6 and 10, talks about... Shall establish a program of cooperation for operations in party waters. Party waters are Jamaican territorial waters. Article 10 talks about cooperation of actions to enforce these provisions in the waters requests the assistance of the other, as was done here. The United States doesn't just barge into these countries willy-nilly. We didn't just decide for ourselves to go into Jamaica and start enforcing U.S. laws. The United States and Jamaica entered into a treaty under the UN Convention to establish cooperation so that when, under the consent and request of the territorial nation, they can request United States assistance, they can request and authorize U.S. ships to enforce. At that point, it's still enforcing Jamaican law. Until they see jurisdiction under the treaty protocols, when they first request assistance from the United States, coast guard vessels usually, to go into either a flagged nation and board a flagged vessel, it's the same procedure we use with flagged vessels. We have to have the request or consent given by the interested foreign nation. Regularly, this court has upheld the authority of the United States with the consent and request of the foreign flagged nation to go onto their flagged vessels. The same situation happens here under the MDLEA, which has provisions for foreign flags and for foreign waters. Under the Jamaica Bilateral Agreement, it's Article 6 and 10, that is what happened here. To the extent that we want to justify this power because the treaty regime has called for the United States to do so, that's what happened here. It could be upheld under the treaty power alone. Wasn't the MDLEA enacted before either of these two that you're focusing on? Yes, Your Honor, but then A, it was recodified and amended to strengthen the cooperation provisions after both of these treaties. When you say recodified and amended, was it re-ratified by the U.S.? The entire statute was not re-ratified by Congress, but provisions dealing with the cooperation with treaty nations was amended and therefore repassed by Congress. That amendment occurred in 2006. The UN Convention was adopted in 1988, and when Congress ratified the UN Convention, the language of the congressional history ratifying the treaty recognized that this treaty was the culmination of a four-year effort led by the United States to coordinate this international comprehensive scheme. And that four-year period... Are you saying that these amendments and codifications of the treaties were ratified by a separate vote of the Senate subsequent to the MDLEA? I'm saying that the statute was amended in 2006. The statute was amended? The MDLEA. So to the extent that this Court finds that the Congress would have to have acted after the treaties, that was congressional action after the treaties. And I think we cite in our brief also several other instances of Congress acting to strengthen the effect of the MDLEA after the treaties. But even so, I think the Court could also find that the treaty and the MDLEA were part of contemporaneous congressional action. Congress had called and passed resolutions calling for the treaty to be completed. The action of Congress ratifying the UN Treaty talked about this being part of the four-year effort during which the MDLEA had been enacted. So I think you have both the initial enactment of the MDLEA being part of this treaty process that the United States was leading and Congress was calling to be completed when it enacted the MDLEA. It called for this UN Treaty to be completed. This was all part of a contemporaneous action. But even if that were not sufficient, Congress, since the passing of these treaties, has acted several times to strengthen the MDLEA and to amend specifically the provisions of cooperating with foreign nations for their consent to jurisdiction since the enactment of the treaty. All of that is cited with more detail in our brief. But specifically, the amendments to strengthen cooperation were in 2006, many years after the enactment of these treaties. So we're here exploring the limits of the Foreign Commerce Clause, and you've certainly identified the treaty and the bilateral agreements. Are there other outer limits? The concerns that have been raised by opposing counsel are certainly that this just gives the United States the ability to start intervening everywhere in the world. What other limits, if any, are there besides the treaties, the bilateral agreements? Again, it's clear that that's not what the MDLEA does, nor is it seeking universal jurisdiction, nor is it argued or being claimed in this case. We were acting under separate provisions, such as the protective principle, which addresses the due process limitation on the extent of the foreign treaty power. These are, again, a two-step question. Does Congress have the power, and then are there due process limits on the exercise of that power? The protective principle limits the exercise of that power to instances where there is a demonstrated threat to the interested nation and that it is a generally condemned behavior, which I think has been well established by this Court, which has applied the protective principle to the MDLEA in numerous cases. And I quickly want to point out that although those have been in cases on the high seas, the fact that the protective principle only applies to foreign flagged vessels on the high seas, it does not apply at all to stateless vessels on the high seas, shows that the point of the protective principle is in cases of overlapping national interest, be it foreign flag or in this case foreign territory. The fact that it doesn't apply at all to stateless vessels on the high seas shows that the protective principle is not limited to high seas location. There is nothing about the elements of the protective principle, a threat to the nation, generally condemned behavior, that references or relies on the high seas location. And in fact, Baston shows that this Court has applied the protective principle inside the territory of Australia. And it did so without referencing the fact that there were other U.S. ties in that case, both the Commerce Ruling and the Due Process Ruling in Baston. If you look at the pages where those rulings are made, and the Foreign Commerce is on 666-688, and the Due Process Ruling, I don't have it handy, I'm sorry, but it is in the case. Both of those rulings are made without reference to the U.S. ties. There is a separate alternative holding which would also have upheld it under some U.S. ties there. But that was not the basis for the commerce power, nor was it the basis for the alternative due process holding. Statute, in order to get a conviction, I forget whether it was jury or plea, in order to get a conviction there had to be a finding that it was in or affecting foreign commerce. In the Baston case. Yes, again, that's the statute that we started out with here a few minutes ago, right? In or affecting interstate or foreign commerce. There had to be a finding, I say, either by jury or by plea, that that was the case, even though you called it wholly within Australia. That is in the language of the sex trafficking statute, and that goes to the jurisdictional elements of that statute. As to the scope of the commerce power, Baston and Raich and other cases make clear that the scope of the commerce power stands on its own. What is written in the Constitution defines the scope of Congress's power. And the elements under the Supreme Court's Raich decision and this court's Baston decision, which address what is necessary for Congress's exercise of that power to be pursuant to the Constitution, is that Congress rationally finds that it has a substantial impact in the aggregate on commerce. And the international drug trade is recognized and Castillo does here. The United States has pledged with its treaty partners to combat the international drug trade to the fullest extent of the law. We have a comprehensive bilateral scheme to affect the treaty and to enforce the MDLEA. And these convictions should be affirmed. Thank you. I want to start with the language of the treaty. First of all, there is no case where any court that I'm aware of, and certainly not this court, has ever held that general principles in a treaty are sufficient to justify congressional action. And I call it the Chuckie Taylor case. In the Belfast case, and the Ferry case, and in the Liu case out of the Second Circuit, and in the Noel case that opposing counsel submitted a supplemental authority last week, this court found that the statute tracked the language of the treaty in all material respects. It was nearly verbatim is what the court said in Noel. The statute, the Jamaican treaty, simply does not allow for this. And even though it allows for cooperation in terms of law enforcement, in each and every case where there's law enforcement action contemplated in the territorial waters of the nations, it is contemplated to be under control of that nation. And I would point the court both to Article 7 and Article 8 of the Jamaican Bilateral Agreement, Paragraph 3, where they're talking about letting U.S. ships in Jamaica and letting Jamaican law enforcement officers on those ships. Paragraph 3 of Article 7, all law enforcement activities under this article shall be under the control and direction of Jamaican law enforcement officials and shall be conducted in accordance with Jamaican law. As I understand it, then, the Jamaicans, the third step, they specifically permit the U.S. vessel to leave with the criminals on board. That is absolutely true, Your Honor, but that's not pursuant to the treaty. The government in its brief twice stated that Jamaica consented pursuant to the treaty, but the citation in the record in both of those places are the factual proffers of the plea agreements, which say nothing.  These treaties don't affirmatively supply positive action for the United States to prosecute these individuals. If the executive branch had negotiated that, ratified by the Senate, absolutely. But we can't have Congress then willy-nilly using a treaty as a springboard to do whatever it wants. With respect to the foreign commerce power, Congress cannot simply enact legislation that affects foreign nations and then call it a comprehensive regulatory scheme, thereby expanding its own authority under Raich. In Raich and Wickard, Congress indisputably had the authority to control the entire market under the Interstate Commerce Clause. Both cases talk about the Supremacy Clause and Congress' ability to reach its laws into and affect intrastate commerce. There is no closed regulatory authority over all drugs in all the world. I absolutely agree with Mr. Colan when he says what is written in the Constitution defines its powers. The Foreign Commerce Clause only provides for regulation of commerce with foreign nations. There is no limiting principle, as Your Honor Judge Boggs noted in the government's argument. It allows for unrestrained global jurisdiction. It leads to exactly the absurd results that have been discussed here today, and the judgment of the District Court should be reversed.